# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 09-3498

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| Michael Roman Afremov, | * | |
| | * | |
| Defendant-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Computer Forensic Services; | * | |
| Mark Lanterman, | * | |
| | * | |
| Movants-Appellees. | * | |

_____

Submitted: June 16, 2010
Filed: July 29, 2010

_____

Before LOKEN, ARNOLD and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

This case involves a contract dispute between the defendant in a federal criminal case and third parties that the defendant served with subpoenas duces tecum.

The district court found that it had ancillary jurisdiction to decide the contract claim, even after entering final judgment in the criminal case. On the merits, the court found that the defendant had hired the subpoenaed witnesses to perform expert consulting services and ordered the defendant to pay a disputed bill in the amount of $628,737.33. We hold that the district court lacked jurisdiction to decide the contract claim. Accordingly, we vacate the district court's order and remand with instructions to dismiss the ancillary proceeding.

## I.    BACKGROUND

The seeds of this appeal were planted in 2002, when Michael Afremov's former business partners decided to force Afremov out of the closely held corporation they had founded together, AGA Medical Corporation. In October of that year, Afremov sued in state court, seeking to regain his position with AGA. AGA, through a court-appointed receiver, retained Mark Lanterman, a computer forensic analyst, to collect, search, and deliver certain electronic files stored on hard drives, disks, and the like. At the time, Lanterman was employed by a consulting firm called Espiria. Lanterman eventually left Espiria to found his own firm, Computer Forensic Services ("CFS"), taking the AGA job with him.

In October 2005, the state court issued a sealed order that is not included in the record on appeal. According to the parties, the order discharged the receiver and provided that AGA must preserve all files relating to the civil litigation for a period of time, during which Afremov would be allowed to access them. This apparently marked the end of the initial action in state court.

In June 2006, Afremov was indicted on charges of mail fraud and conspiracy to commit mail fraud. The indictment alleged that Afremov received kickbacks from a parts supplier in exchange for committing AGA to do business with that supplier (unbeknownst to AGA's other shareholders). The federal grand jury later returned a

superseding indictment that added charges of money laundering and filing false tax returns.

On April 18, 2007, Joseph Petrosinelli, one of Afremov's attorneys, sent a letter to Lanterman, informing him that Afremov intended to subpoena certain documents from the AGA civil litigation that remained in Lanterman's possession. Here is what the letter said:

> We represent Michael Afremov in connection with the above-captioned criminal case [*United States v. Afremov*], now pending in federal court in Minneapolis. We understand that some time ago, in your capacity as an expert consultant to the Receiver of AGA Medical Corporation, you and/or your company took custody of certain AGA documents, including electronic files. We believe those documents contain information that is relevant to our defense of Mr. Afremov in the criminal case, and at the appropriate time we intend to serve subpoenas on you and your company calling for production of the documents to us. Thus, we request that you preserve such documents in your possession, and that you conduct whatever compilation and review of the documents that you believe is necessary in advance of production to us. For your information, the trial is currently scheduled for September 10, 2007, and we intend to serve our subpoenas well in advance of that date.

> We note that on October 24, 2005, the trial court in the . . . [AGA] civil litigation entered an Order concerning discharge of the Receiver, Mr. Afremov's right to continued access to AGA's litigation files, and other matters. Pursuant to that Order, Mr. Afremov will pay any costs, including reasonable attorney's fees, that you incur in connection with responding to this request and the forthcoming subpoenas. Please send all bills for such costs to my attention at the above address.

One day after sending the letter, Afremov served the subpoenas. Lanterman was commanded to appear in the district court on September 10, 2007, and to bring with him the following documents:

1.  All documents, including all electronic files or data, obtained from AGA Medical Corporation or any of AGA's officers, directors, owners, employees, attorneys, or receivers.

2.  All documents, including all electronic files or data, that refer, relate, or pertain to Franck Gougeon, Kurt Amplatz, Michael Afremov, AGA Medical Corporation, Frederick Fischer, or Foremost Machining Company.[1]

3.  All electronic mail created or received by Franck Gougeon, Kurt Amplatz, Michael Afremov, or any officer, director, or employee of AGA Medical Corporation.

Thereafter, Afremov's local counsel, Frank Berman, discussed the document production on more than one occasion with Lanterman and his counsel.

Lanterman says he thought that Afremov had retained CFS to perform a full-blown consulting project at its ordinary rates. Lanterman allegedly had CFS staff work in shifts, twenty-four hours a day, restoring, copying, decrypting, extracting, searching, collecting, verifying, and delivering the relevant data. Lanterman has attested that CFS spent more than 1,500 hours processing the equivalent of four million printed pages of information. Afremov asserts that Lanterman ultimately turned over only about 1,200 pages of documents. Along with these documents, Lanterman sent Afremov an invoice dated June 15, 2007, which set out charges in the amount of $674,861.08, including $46,123.75 in attorney's fees. Afremov paid the portion of the invoice covering attorney's fees but refused to pay the balance.

In October 2007, Petrosinelli sent a letter to Lanterman's counsel, stating that Afremov viewed Lanterman as a "fact witness" (as opposed to an expert consultant)

[1]Gougeon and Amplatz are Afremov's former business partners. Fischer was Afremov's alleged co-conspirator and the owner of Foremost Machining Company, the parts supplier that purportedly sent kickbacks to Afremov.

-4-

and offering to reimburse Lanterman for the "actual, reasonable, out-of-pocket costs he incurred in providing the requested documents." Informal settlement negotiations between the parties were unsuccessful.

On March 3, 2008, Lanterman filed a document in the district court styled as a motion to quash the subpoenas under Rule 17 of the Federal Rules of Criminal Procedure.[2] (Afremov's trial, originally set to begin in September 2007, had been rescheduled for April 2008.) Lanterman first argued that "[t]he subpoenas as served are incredibly overbroad," and asked the district court to quash the subpoenas on that basis. Lanterman went on to assert, however, that Afremov had promised to pay for his expert consulting services in connection with the documents he was commanded to produce. Lanterman noted Afremov's refusal to pay for the work CFS had already performed and claimed that processing the rest of the data would involve "immense" effort. Although some of the language in Lanterman's briefing in the district court is imprecise, he evidently sought a declaration that the subpoenas did not require "continued performance" of the alleged contract for expert consulting services. Lanterman also asked the district court to hold Afremov and his counsel jointly and severally liable for $674,861.08, the entire amount of the June 2007 invoice.[3]

Less than three weeks later, Afremov entered into a plea agreement with the Government. In accordance with that agreement, on March 19, 2008, Afremov pled guilty to three tax charges. The same day, the district court cancelled a scheduled hearing on pre-trial motions.

---

[2]Hereafter, we will typically refer only to Lanterman, without adding "and CFS." As far as we can tell, Lanterman's contract claim and the arguments he makes on appeal are coterminous with his company's claim and arguments, so our analysis applies equally to both Lanterman and CFS.

[3]This request ignored the $46,123.75 in attorney's fees that Afremov had already paid.

John Bonner, one of Lanterman's attorneys, sent a letter to the district court, dated March 20, 2008, requesting a new hearing date on the motion that Lanterman filed on March 3. Bonner observed that the motion asked the court to do two things: "(1) to quash subpoenas served by Defendant Afremov pursuant to Rule 17(c), and (2) to order Defendant Afremov and counsel to pay . . . [CFS's and Lanterman's] costs in responding to the subpoenas as agreed by them [sic]." Bonner then wrote the following:

> While we understand that the trial has been indefinitely postponed (if not mooted) based upon the . . . plea[s] entered on March 19, we believe that the issue regarding payment of . . . [CFS's and Lanterman's] costs to access, verify, process, and produce documents under the Rule 17(c) subpoenas prior to trial, as agreed to by Afremov and counsel, remains pending before the Court.

The district court referred the motion to a magistrate judge, who ordered briefing and held two hearings. After the referral, Lanterman sent Afremov a second invoice, setting out additional charges in the amount of $178,850.

On July 17, 2008, the magistrate judge submitted a report and recommendation to the district court in which she recommended finding that a contract had been made, that the charges set out in the first invoice were reasonable, and that the charges set out in the second invoice were unreasonable. Based on these findings, the magistrate judge recommended ordering Afremov to pay $628,737.33, the unpaid balance of the first invoice, to CFS.[4]

Afremov filed objections to the report and recommendation and submitted two supplemental memoranda. In his first supplemental memorandum, Afremov introduced a new objection, arguing that the district court lacked subject matter

---

[4]The magistrate judge issued an amended report and recommendation on August 14, 2008, but the proposed findings and order did not change.

jurisdiction over the pending motion. In particular, Afremov asserted that the only possible source of power to consider the motion was "under the limited doctrine of ancillary jurisdiction[,] . . . [which] 'recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them.'" (Quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994).) Afremov argued that the requirements for exercising ancillary jurisdiction were not met because the motion raised "a state-law breach of contract claim" that was neither "factually interdependent" with the criminal case nor something the court must decide in order "to function successfully." (Quoting *Peacock v. Thomas*, 516 U.S. 349, 354 (1996), which in turn quoted *Kokkonen*, 511 U.S. at 379-80.)

On July 21, 2009, the district court sentenced Afremov to a term of probation and a fine. One month later, the court entered a written order describing the final judgment in the criminal case. Afremov did not appeal his conviction or sentence.

On September 28, 2009, the court issued an order adopting the magistrate judge's report and recommendation concerning the so-called "motion to quash." *United States v. Afremov*, No. 06-196, 2009 WL 3164739 (D. Minn. Sept. 28, 2009). Having already addressed the merits, the district court took up the threshold question of federal subject matter jurisdiction at the end of the analysis section of its order. *See id.* at *7. The court noted at the outset that it "look[ed] very dimly on Afremov's raising of a jurisdictional issue so late in the litigation." *Id.* The court then quoted *Peacock v. Thomas*, in which the Supreme Court reiterated that federal courts may exercise ancillary jurisdiction "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* at *8 (quoting *Peacock*, 516 U.S. at 354). The district court went on to say that it was "satisfied that its resolution of a matter that has consumed extensive judicial resources—without objection from parties who

stood to benefit a good deal from avoiding the expense of an entirely new lawsuit—falls well within the bounds of that standard." *Id.* "In short," the court explained,

> the evidentiary materials in dispute were closely tied to Afremov's defense against a significant criminal case in this Court; this motion arose out of an invocation of this Court's subpoena power; and the federal court system's interest in managing its resources is plainly implicated by a party seeking to shift venues only after having discovered the [recommended] outcome.

*Id.* (internal citation omitted). The district court thus ordered Afremov to pay $628,737.33 to CFS. *Id.*

Afremov appeals, arguing that the district court lacked jurisdiction to decide the contract claim. Afremov argues, in the alternative, that he did not contract with Lanterman for expert consulting services, and that even if an enforceable contract had somehow been made the charges set out in the first invoice were unreasonable.

## II. DISCUSSION

We start our discussion by reaffirming our adherence to two principles that should be beyond all doubt: namely, that federal courts are courts of limited jurisdiction, and that parties may not enlarge that jurisdiction by waiver or consent. *See, e.g.*, *Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.*, 551 F.3d 812, 816 (8th Cir. 2009). It follows that challenges to federal subject matter jurisdiction may be raised at any time, even for the first time on appeal. *See, e.g.*, *4:20 Commc'ns, Inc. v. Paradigm Co.*, 336 F.3d 775, 778 (8th Cir. 2003). Indeed, if Afremov had not challenged the district court's jurisdiction in his supplemental memorandum to the district court, we would have examined the jurisdictional issue on our own initiative. *See, e.g.*, *United States v. Meyer*, 439 F.3d 855, 858 (8th Cir.

2006) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." (alteration in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998))).

With those fundamentals in mind, we proceed to review de novo the question whether the district court had subject matter jurisdiction. *See id.* at 859. The burden of establishing that a cause lies within the limited jurisdiction of the federal courts is on the party asserting jurisdiction: in this instance, the burden is on Lanterman. *See Ark. Blue Cross & Blue Shield*, 551 F.3d at 816 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

The parties agree that the jurisdictional inquiry turns on whether the district court had ancillary jurisdiction over Lanterman's motion. So it bears repeating that the doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Kokkonen*, 511 U.S. at 378. As the district court recounted, the Supreme Court has identified two purposes for which a federal court may exercise ancillary jurisdiction: "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (quoting *Kokkonen*, 511 U.S. at 379-80).

Lanterman seeks to establish that his motion was incidental to the criminal case against Afremov, which the district court plainly had jurisdiction to adjudicate. To that end, Lanterman suggests that the district court had authority to consider the motion under either head of ancillary jurisdiction. Regarding the first head, Lanterman contends that the court had jurisdiction because "the subpoenas, the documents sought, the work performed, and [CFS's] fees were 'factually

interdependent' with Afremov's criminal defense."  Regarding the second head, Lanterman contends that the district court had jurisdiction "to manage its proceedings" and "vindicate its authority" because Afremov had "invoked the district court's subpoena power" under Rule 17.  We reject both contentions.

As Afremov points out, the central premise of Lanterman's first contention is that certain things are germane both to the ancillary proceeding and to the criminal case—*i.e.*, the subpoenas, the subpoenaed documents, and so on.  But Lanterman has offered no plausible argument for finding that the *claim* raised in his motion is factually or logically interdependent with any of the criminal charges against Afremov.  Indeed, Lanterman appears unwilling or unable to pin down the precise nature of his claim.  There is no good reason for such obscurity, however, since the pertinent claim quite obviously sounds in contract.  How could it be otherwise when the district court ordered Afremov to pay an invoice stemming from an alleged private agreement to pay for expert consulting services at the expert's ordinary rates?

Lanterman has failed to show that his state law breach of contract claim has a meaningful connection to the criminal charges against Afremov.  Resolving the contract claim will not affect the final judgment entered in the criminal case.  *See Bounougias v. Peters*, 369 F.2d 247, 249 (7th Cir. 1966) (holding that a district court lacked ancillary jurisdiction to decide a fee dispute between a prevailing plaintiff and his lawyers, in part because the result of the dispute "[would] not make more complete or satisfactory or, indeed, even affect the judgment of the district court in the . . . personal injury litigation which generated the fees").  Perhaps more importantly, the material facts underlying the criminal charges—for instance, the who, what, where, and when of the alleged kickback scheme—do not overlap with the material facts underlying the contract claim.  *See Peacock*, 516 U.S. at 355 (suggesting that a lack of factual and logical entwinement between primary and ancillary claims precludes the assertion of authority under the first head of ancillary jurisdiction).  We are persuaded that the primary and the ancillary claims in the

present case are even less entangled than the claims in other cases where courts have found an absence of subject matter jurisdiction. *See, e.g.*, *Stein v. KPMG, LLP*, 486 F.3d 753, 760-64 (2d Cir. 2007) (holding that the district court, which had jurisdiction over a criminal prosecution, lacked ancillary jurisdiction "to adjudicate a contract dispute between the defendants and [their] nonparty former employer" about whether the employer was obligated to advance the defendants' legal expenses); *Taylor v. Kelsey*, 666 F.2d 53, 54 (4th Cir. 1981) (per curiam) (holding that the district court lacked ancillary jurisdiction to resolve a fee dispute between two attorneys who represented the plaintiffs in an action against a chemical company); *Bounougias*, 369 F.2d at 249-50 (see above).

Lanterman's fallback position is that this action involves more than a run-of-the-mill contract dispute; thus, he returns time and again to the theme that Afremov dragged him into the criminal case by serving subpoenas under Rule 17 to demand documents from the AGA civil litigation. Lanterman insists that the district court had authority under the second head of ancillary jurisdiction to address Afremov's misuse of the subpoena power. We are not convinced, however, that the subpoenas have any real importance for the jurisdictional inquiry in this case.

Recall that the subpoenas did not mention expert consulting services—they commanded Lanterman to appear in the district court and to bring with him certain documents. The subpoenas did not direct Lanterman or his company to expend an enormous amount of time and effort to restore, copy, decrypt, extract, search, collect, verify, and deliver the relevant data. As Lanterman acknowledges, "CFS would have been within its rights, and met its obligations under the court's subpoena power," if it had "*simply grant*[*ed*] *access to the underlying hardware containing the data.*"[5] (Emphasis added.) Hence, the district court found that "Afremov's relationship with

[5]Here, Lanterman is clearly using "CFS" as shorthand for "Lanterman and CFS." Elsewhere in his brief, Lanterman notes that the subpoenas served on him and his company "demanded the identical documents."

CFS *rose above a relationship with a subpoenaed witness*," and instead "*constituted an agreement* [*i.e.*, a contract]" calling "for Afremov to compensate CFS for its forensic services." *Afremov*, 2009 WL 3164739, at \*5 (emphasis added).

Afremov states, correctly in our view, that the district court's order "did not award Lanterman anything under Rule 17," but rather, "enforced the claimed contract." That Lanterman raised the state law breach of contract claim in a filing styled as a motion to quash turns out to be inapposite. For even assuming that in addition to seeking contract damages Lanterman initially sought to quash the subpoenas under Rule 17, the Rule 17 claim was mooted either when Afremov pled guilty to the tax charges, or when final judgment was entered in the criminal case, but certainly before the district court issued its order. John Bonner, Lanterman's lead counsel on appeal, virtually admitted as much in the letter he sent to the district court following Afremov's guilty pleas, in which he strongly implied that Lanterman's request for an award of "costs" was the only ancillary claim still pending.

Once the issue is properly framed, we have no difficulty concluding that Lanterman's reliance on the second head of ancillary jurisdiction is misplaced. The contract dispute was not an inevitable consequence of the criminal case. *See Taylor*, 666 F.2d at 54. And the notion that the district court acted merely to check an abuse of the subpoena power is transparently false. Simply put, the district court's decision to decide Lanterman's state law breach of contract claim was not a matter of managing its proceedings, vindicating its authority, or otherwise preserving its ability to function successfully. *See Peacock*, 516 U.S. at 354; *see also, e.g.*, *Bounougias*, 369 F.2d at 249 (finding that the ancillary proceeding could not be said to "relate[] to matters coming so near to the life and dignity of the district court that an exercise of inherent powers to protect its authority was necessary"). It is of no moment whether

Lanterman initially sought to quash the subpoenas themselves, since by September 2009 the relief Lanterman sought had come completely untethered from Rule 17.[6]

We note that the district court was understandably distressed by the parties' failure to raise the jurisdictional issue before "significant judicial resources" had been expended. *See Afremov*, 2009 WL 3164739, at *7. Nevertheless, the Supreme Court has made clear that "'neither the convenience of litigants nor considerations of judicial economy' can justify the extension of ancillary jurisdiction" beyond its usual limits. *Peacock*, 516 U.S. at 355 (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 377 (1978)). And in any event, leaving aside the judicial resources spent before the jurisdictional issue was finally raised, the prospective benefits of exercising ancillary jurisdiction to decide a state law breach of contract claim that had little or no factual or logical interdependence with the underlying criminal charges (which of course had already been disposed of) were likely outweighed by the costs. *See Stein*, 486 F.3d at 762 ("[W]hile the ancillary proceeding is a major undertaking, its contribution to the efficient conclusion of the criminal proceeding is entirely speculative."); *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 499 n.9 (1st Cir. 2000) ("[A]ny possible judicial economy from the simultaneous adjudication of

---

[6]We express no opinion about whether the district court could have exercised ancillary jurisdiction over a claim seeking reimbursement of out-of-pocket costs that were traceable to the subpoenas rather than the alleged contract for expert consulting services. *See generally* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2459, at 456-58 (3d ed. 2008) (stating that when a subpoena issued under Rule 45 of the Federal Rules of Civil Procedure—the civil counterpart to Rule 17—would impose an undue burden, district courts may "condition denial of [a] motion to quash or modify upon the person who requested the subpoena advancing the reasonable cost of producing the material sought"). Afremov is unquestionably correct in saying that "Lanterman did not seek reimbursement for costs based on [Rule 17,] . . . or any right running to the recipient of a federal subpoena, and the district court did not award that relief."

interdependent facts vanished when the initial proceedings closed."). Under these circumstances, the district court should have dismissed the ancillary proceeding.

## III.  CONCLUSION

For the foregoing reasons, we vacate the district court's order and remand with instructions to dismiss the ancillary proceeding for lack of jurisdiction.

_____